Thank you. Mr. Ginsberg ready to proceed? Yes, I am. Okay. Good morning, Judge McKee and may it please the court, Daniel Ginsberg for the plaintiff appellant, Devin Jefferson. And I respectfully request four minutes for rebuttal. Okay, fine. In order to state a claim for a violation of the Fourth Amendment, a plaintiff must show first an unreasonable use of force in connection with an arrest. And second, if the officer claims qualified immunity, that there is settled law, either in the form of controlling authority in the circuit or a robust consensus of authority from other courts of appeals, that the actions taken by the officer could lead to liability. And these two elements must be examined separately, though not necessarily in that order. And let me start you with the second question, would you frame the right at issue here? The right at issue here, Your Honor, is that a person has the right not to be seized, or not to be arrested with the use of unreasonable force, when he or she is not fleeing, or excuse me, when he or she may be fleeing from the police, but is has not, for example, struck any individuals or police officers, police vehicles, is not known to be armed or wanted or known to be dangerous, has not verbalized an intent to kill driven with abandon. Even if they're known to be wanted, would that, under the cases, would that be sufficient, assuming no reasonable concern about risk of serious injury to others, but the person fleeing is wanted? Would that be sufficient to use deadly force to stop the person? I think, Your Honor, it would depend on whether what the person was wanted for, person was wanted for murder, obviously, that would, I think, lead to a higher form of need to place that person under arrest, obviously, kidnapping, things of that nature. But if the person was wanted simply for something like shoplifting, or, you know, perhaps a simple assault, then the use of the then the scale begins to balance against the use of deadly force to the rest of that person. Okay, Ginsburg, this is a very fluid situation, because the vehicle had been pursued for some time. Officer Rios had to make a split decision, because Jefferson was proceeding in his direction. Isn't that a sufficient reason to justify the use of force? And the vehicle was coming at him, although it just about to pass him and was parallel to the officer. Why isn't that an appropriate circumstance for the use of force? Well, Judge Fuentes, I would say that, first of all, I would respectfully disagree that the vehicle was coming at him. I think the vehicle, according to the video, was proceeding in the right lane of traffic is I should say, in the correct lane of traffic and proceeding past Officer Rios and Officer Rios exited his vehicle. And I gotta stop you there. That is a phrase, which is like fingernails across the blackboard. I heard it so often when I was a child court, you get out of the car, but go ahead. But go ahead. I hate that phrase. I flagged my law clerks if they ever put that in a memo. All right. Understood, Judge. So he got out of the car and ran around the hood of his car towards the appellant's vehicle. And so he was not merely he was not standing in the way of the appellant driving at him. In fact, I think a significant point in this case is that he felt safe enough based on what he saw from the appellant and based on his driving that he made his way toward plaintiff's vehicle as it was proceeding down, I believe it was Jefferson Avenue. He did have a weapon drawn, if I'm not mistaken, and was pointing it at Jefferson. Am I correct there? I'm sorry, Your Honor, whether Officer Rios had his weapon drawn? Yeah, I thought he did. The facts that I read, he had a weapon drawn and was pointing it at the vehicle as it was proceeding in his direction. Am I mistaken about that? No, Your Honor, I think that's correct. I think he did draw his weapon soon after he got out of the vehicle. And with his weapon drawn, though not necessarily pointed at the appellant's vehicle, he ran toward the vehicle, settled into a shooting position and fired when the vehicle was passing him. He had to make a split second decision, as I can tell from the record. Why is that not sufficient reason to justify the use of force? Well, because, Your Honor, split second decisions alone, I don't think are sufficient to create justification for the use of deadly force. It's just the nature of policing that a lot of times, especially in police pursuit cases, that officers must make a split second decision, but at the same time, pulling the trigger is a split second act. And Officer Rios testified that when he saw the plaintiff or the appellant proceeding toward him, he did not open fire. He did not open fire until even when the appellant's vehicle was a car length away from him. He only opened fire when the vehicle was already passing him. So although he did make a split second decision to open fire, he made that decision several split seconds after there was some potential ambiguity as to when, excuse me, some potential ambiguity as to what the appellant's intentions were with the vehicle. This would be a different case if he saw the vehicle proceeding toward him and opened fire, sort of, you know, when the vehicle was farther away down the street, but he let the vehicle continue on, had time to, like I said, settle into a shooting position, and only opened fire when the vehicle actually was passing him. It's out of standard argument, one of the factors we have to consider is the severity of the crime, correct? Yes, Your Honor, that's under the request. And in this case, Officer Rios did not know anything as to whether this individual was armed, if he was dangerous, what he was wanted for, all he knew that it was a car chase, correct? That is what Officer Rios testified to, yes, Your Honor. That's what he, that's all he knew, right? Correct. And when he assumed a shooting position, he was not in harm's way, he was adjacent to the driver's side of the car, correct? That is correct, Your Honor. And that's when he fired a shot and shattered the individual's arm, right? Yes, Your Honor. And is it from a fair look at that video, there was nobody, there was no police in front of that automobile when he fired, correct? There was no police, there was no civilians, there was nobody on the street. That is correct. Another one of the factors we have to consider is if there's an immediate threat of safety to the police or others, correct? That is correct, Your Honor, yes. And your position is that nobody was in harm's way? Once the... When the shot was fired, and that's the moment we're talking about. Correct, Your Honor. When the shot was fired, there were no civilians in the vicinity and Officer Elias, as Your Honor pointed out, was perpendicular to the vehicle and fired... And there were no police officers either in front of the car, there's nobody in front of the car. There was nobody in front of the car, that's correct. So the district court cited, I think it was a Thompson case, right? In support of his position? Yes. Were the facts in Thompson analogous to this case? Were the facts in this case more analogous to, I forget the name of the... Cox, I think it's Barnaby Cox. And Eberhardinger? Well, so the facts in Webb, I think are different, significantly different, because in that case, the police officer was contending with an individual that he was warned about was dangerous. In that case, the officer had gotten into an altercation with that individual, struck him with a police baton, threatened him with a taser, and believed that the individual ran from one side of the car to another to retrieve a weapon. That officer was halfway inside the vehicle when the appellant in that case took off and intentionally directed his vehicle into another police officer's vehicle and struck that police vehicle. None of that happened here. So the officer was afraid of being dragged. And in fact, it looks like he either would have been or was being dragged when he fired the gun in the state of Webb. Yes, Your Honor. So yes, in the state of Webb, yes, he believed that he was... His hands were in the vehicle, at least. And he was afraid of and I apologize, I actually misconstrued that question from Judge Restrepo. I confused the Webb case with the other case that the district court cited. The Webb case was in the city of Newark. And yes, although they're similar, because in that case as well, the officer did believe that suspect had a weapon, was reaching for it. And he was halfway inside the vehicle and opened fire because he believed that he would be dragged. In the other case that the district court cited, as I said, there was an altercation and the appellant in that case actually intentionally struck another police officer, another police officer's vehicle with his own, which led that initial officer as well as the officer who was driving that vehicle to open fire upon him. And as he was driving away in that case, he ran over lawns, sidewalks, and almost hit a parked car. Again, the facts in this case, in these cases do matter. And the Supreme Court has said that regardless of what it says on any specific topic, on any of these cases, that the facts of these cases matter. And there's a fact bound morass of reasonableness, as the Supreme Court said in Scott and as Justice Ginsburg pointed out in her concurring opinion, that make it impossible to it's possible to make a determination based on whether an officer acted reasonably. And what Officer Elias, I think, relies on in this case for his entitlement to qualify immunity is that the Supreme Court has never held that police officers were not entitled to use deadly force during vehicular police pursuits. And that may be true, but the facts of, like I said, the facts of these cases do matter. The Supreme Court's pursuit cases, Scott, Mullen, Plumhoff, all dealt with what Justice Scalia in the majority opinion and Scott described as Hollywood style chases of the most frightening sort, where you had intoxicated, heavily armed drivers weaving in and out of traffic, exceeding speeds of 80 miles per hour, driving the wrong way down one-way streets, colliding with police vehicles, threatening to kill officers. And sure, under extreme circumstances like those, the use of deadly force could be appropriate. So you rely heavily on Eberhardinger. It's an NPO that you cited repeatedly in your brief and references to Abrams. So how close are the facts in Eberhardinger, I hope I'm pronouncing that right, to the case we have here? I, well, I think in Eberhardinger and Justice Fuentes, excuse me, Judge Fuentes. You can call him Justice. Yeah, we're all hoping. Hope springs eternal. Judge Fuentes was on the panel in Eberhardinger. I think the facts were very similar. In Eberhardinger, it was the same situation where the driver of the vehicle had flown, had tried to escape the police. He had driven with abandon. But ultimately, at the point of the shooting, the officer, there was a video on that case as well, but the officer in that case, the video indicated that the officer fired as the vehicle was passing. And the ballistics evidence indicated the same thing. So, and also in that case, as in this case, the officer said, I was afraid for my life and I was afraid for other civilians in the area. And what this court said is that the facts there were closely analogous to those in Abraham, where the officer fired as the vehicle was passing. And there was no danger to anybody in the area because the officer was parallel to the vehicle as it was passing him exactly as in this case. So I think the facts here are very similar to Eberhardinger. And for that reason, there is what the district court should have done was to deny qualified immunity and find in favor of believed himself to be in danger that he believed that there were there was danger to other civilians, but there are factors. Again, as I said, the fact that he ran towards the vehicle and the other officers on the scene were running towards plaintiff's vehicle. So that's not dispositive, I think one way or the other, but at least it indicates that that they were not necessarily afraid that appellant was driving erratically or uncontrollably such that they were in danger of One point, Mr. Ginsburg, may I ask one question? You may have answered it, but I'd like to ask this anyway. I'm imagining myself in the officer's position. And if the shooting is not reasonable, as you argue, in these circumstances, what should the officer have done in that in those seconds that he has to make a decision? What should he have done? Well, he simply could have just let the vehicle pass your honor, as the police had been pursuing the vehicle for some time, and he seemed to be somewhat erratic in the in the things that he was doing. And I don't know if Officer Lewis was aware of all of this, but he was aware of the vehicle coming towards him and to his in his direction. So he had to do something. Now, your suggestion is maybe you should have done nothing. Is that it? Well, he, my suggestion, at least, is that he didn't have to use deadly force upon the appellant. He could have let the vehicle pass the record indicates that the police were aware that we're aware of the vehicle's license plate. They were not aware that he had, at that point, done anything potentially more than than stolen the vehicle. So to use deadly force upon the suspect who may or may not have done the the deed of stealing the vehicle, I think is unreasonable. So and the other officers on the scene did exactly that your honor, they just let the vehicle pass one of the officers came close enough to slap the vehicle as it was driving past him. Officer Lewis could simply have let the vehicle pass and either continue to pursue if that was within the guidelines of the Elizabeth Police Department or the fact that the stolen car undermines the fact that they had the license plate number because the license plate number is not going to tell them who's driving the car if the car is stolen. Correct, your honor. Yes, the car is stolen or could be stolen. So so the license plate would not necessarily would not necessarily allow them to go to the home of the of the owner and arrest that person for driving erratically or eluding. But at the same time, the the license plate would at least allow the police to recover the vehicle at some point, perhaps remove fingerprints from the vehicle. And again, there was no indication that there was anything awry in this situation other than the vehicle may have been stolen. So So yes, but but to answer your question, yes, the fact that they had the license plate does not necessarily mean that they should have just let them go and pick them up at a later at a later time. But they to answer Judge Fuentes questions, what could officer Lewis have done other than use deadly force? He could have simply just let the vehicle pass and continue to chase as the police, in fact, that once the shooting occurred, the police all got back into their vehicles and continued to pursue. And that could have been accomplished without using deadly force. And you save some time for about looking quite a bit. So unless I have my colleagues have questions, we'll hear from your colleagues. Yes, Your Honor. Thank you very much. Okay, thank you. Mr. Antonelli, I believe you're first. Thank you, Your Honor. May please the court. In listening to questions from from from Your Honor, what I think is important here and and it's not really raised or often stated in in plaintiff's brief is, you know, we're required under the case law of this jurisdiction in our Supreme Court when you analyze these cases, which are difficult as as we could all see from from the facts of the case. But we are to look at the totality of the circumstances here. The focus, while it is to be on the totality, do we have to limit ourselves to the totality of the circumstances that Officer Elias was aware of when he pulled the trigger as opposed to something that happened before that? Sure. Well, he was aware that there was a pursuit. Right. And that's all he was aware of. Correct. That is correct, Your Honor. Can you distinguish this case from Eberhardinger? Yes, Judge. So so a couple of things. And yes, so when you facts in that case were very analogous to this case. So look at City of York. I think what's important here, and we certainly touched upon this in our in our papers, is plaintiff is presenting to this court, as he did in the district court, an alternate set of facts, which is that Officer Elias was not in any danger. And at the time he fired his weapon, the motor vehicle was passing him. Well, there's really only one set of facts. We've heard this alternate set of facts in a different context. So there's one set of facts. And as you look at the video, there's no dispute that the officer was in a shooting position perpendicular to the driver. Correct. He was not in front of the car. Correct. He was not in front of the car. He was perpendicular to the driver. The driver was passing him. Correct. I don't know that it was perpendicular, Judge, but he was not in front. And he had run to the car, actually. He'd run toward the car. Correct. And so if I could just say this, though, you know, what hasn't been mentioned yet is the heck bar. All right. And in the heck bar, it prevents a challenge. That's a collateral challenge to a conviction. Right. Well, the heck bar, it's not it's not a collateral challenge to conviction because the conviction has not been reversed. It has not been, you know, on a separate issue. And one of the elements of that conviction is that there's a risk of death and an injury to persons. So if you accept that at this moment in time, that that the officer was not in danger or others, it would invalidate that conviction. No, it wouldn't. It wouldn't. Because, again, we have to look at what the officer knew when he fired the shot. Other officers prior to the time that Lee got there may well have been endangered by this guy's conduct. But the fact that he admitted, in effect, in part of the colloquy that is the most crucial to that heck be Humphrey bar, the transcript says the defendant's answer, the defendant there, his answer was inaudible. But the part that is audible, he's basically saying, yeah, he knew that he was creating a risk. He was. He had a fire hydrant before that. But whether or not officer Lee knew any of that is not necessarily implicated. That's a whole different issue from the heck be Humphrey bar. With all due respect, I think it is because we can't parse out the conviction and make a determination that in this moment in time, there was no risk of death or injury to persons. Again, when we look at the case law and what we're required to look at is, again, the totality of the circumstances. And while officer Lee may not have been aware of some of the facts prior to his arrival on scene, he was aware that this individual was alluding and, in fact, continued to allude after the single shot was fired. Number two, number two, there are other cases I'm sure your honor is aware of where the heck bar would not apply to an excessive force claim. But you have to look at the underlying conviction. And in those cases, the element for that conviction did not involve a risk of death or injury to persons. That's exactly what we have here. And if this court were to accept for purposes of the motion that there are disputed issues of fact as to whether or not the officer was in danger or others, and that the motor vehicle was passing by as he discharged his weapon, that would invalidate that conviction. And that's I'm not sure I understand that, because why, from what we can see in the film, and knowing what Lee knew, I don't understand how that would invalidate the conviction. He didn't say who he endangered in that plea. And he may well have endangered, I guess, was Slater was another officer on the scene. The other officers who were there, he was clearly engaged in reckless driving when he hit that fire hydrant. Fire hydrants are not placed in the middle of traffic lanes. I'm not I just don't see how the guilty plea necessarily requires that the conviction that he pled to would be invalid. I understand your argument, but I'm not sure it's your argument. If I can, perhaps to explain a little better. So, you know, what we have here, like, in other words, when there's a guilty plea that's entered, the prosecutor at that point in time is not necessarily thinking that perhaps defendant will be filing suit against the officer. So obviously, could the factual basis have been better here? Sure. But but under heck versus Humphrey, it's not just it's not the factual basis that that is is looked at for purposes of the heck bar. It's the elements of the underlying conviction. So so we could we could sit here for purposes of the motions, except for for argument sakes, which I don't conceive. At this second time, perhaps plaintiff is arguing that there was no danger to obsolete is but but if the moment you accept that the conviction is validated, because it's the transaction, it's not just a piecemeal approach here. So following this argument is logical conclusion, anybody convicted of this offense could be subject to deadly force by the police. Correct. That's what you're telling us. That was you're telling us? Yes, if you accept plaintiff's version of the fact that I'm accepting your argument. So anybody convicted of this offense could be subject to deadly force. Yes, regardless of the circumstances. That's your position. Yes, Your Honor. And in fact, there's been no cases brought before this court except for the one case that I cited in Baker versus City of Elizabeth, an unreported decision out of this court that addressed a similar scenario where there was an eluding charge. And although the factual basis there was better, the court still focused on the elements. If I could, so you're saying, if you're eluding the police, they can shoot you? No, no, Your Honor. That's what you're telling me. What I'm saying is, if there's an eluding charge, and as a result of that charge, you know, defendant is ultimately arrested, pleads guilty to eluding second, the second degree, which requires a risk of death or injury to persons, that that would potentially be a heck bar on a subsequent lawsuit for excessive force in the connection with the use of deadly force. Absolutely. That's what I'm saying. I think it's also important for this court to understand that all the cases cited by plaintiff for the proposition that either, you know, an officer is prohibited from shooting at a car as it's passing by, at no time was a heck bar in all the cases that were cited. Do we know that? Not discussed in the opinions, but we don't know that, do we? Well, I painstakingly looked at every one of them. And when there's a plaintiff that's in the state, obviously, there's no conviction. So clearly, a heck bar doesn't apply. The district court decide this case on heck was a qualified immune. The court decided on two grounds that there's no constitutional violation and qualified immunity, but it did. It did mention, it did not decide on heck versus Humphrey completely, but there was a mention and we had where, where does it mention? They don't specifically cycle heck versus Humphrey. So he doesn't really mention? Correct. Correct. So it's something the district court didn't consider you're arguing that? Yes. Okay. Mr. Antonelli, was there not a response in this case that did not, or maybe I can put it this way, that didn't require the use of deadly force? Your Honor, I don't think so. Because again, in the case law requires us to judge the officer's on scene, not with 20, 20 hindsight. It was a split second decision. You know, it's interesting. Now, there were several other officers at the scene. When he went into a side street or back, back down in the side street, they all stood by that nobody, apparently pulled out a gun and fired. And so it causes me to wonder, could not Officer Reyes have done something other than fire directly into the passenger, rather the driver's position in that vehicle. Could he have done something else? Unless in other words, not the use of deadly force. Judge, again, I don't believe so. When we look at the totality of the circumstances, as to some of the other officers, they clearly were behind this vehicle. Couldn't shoot the tires out of the car. I mean, that was that's, that's an almost an impossibility. I mean, the lone ranger shooting guns, hands and things. I mean, that that is an impossibility. Web could do it. Sergeant Friday. Some of the other officers involved in the transaction were behind this vehicle, which there are clearly cases that say when shots are fired as the car motor vehicles fleeing, that obviously is prescribed and prohibited. But that's what happened here. He was fleeing and he took a shot at the guy. He was fleeing and he wasn't he wasn't in harm's way at that point. So you tell me exactly the scenario you just described. Well, yes. What I'm saying is, is at that moment in time, the split second decision required that I don't necessarily say that the motor vehicle is fleeing. But again, and I know I know I beat up the heck versus Humphrey bar a little bit here. But to accept that factual scenario invalidates the underlying conviction for eluding. I don't know how else to say it, because again, in some of the other cases where heck doesn't apply to an excessive force case, for example, simple assault and simple assault conviction does not have as an element a risk of death or injury to person. And neither does, for example, resisting arrest. In those of course, claim in this particular instance, though, with that element there, with all due respect, I believe this claim has to be barred because if otherwise you accept that that officer was not in danger, either for risk of his death or as the other person. What we have said, and I think the cases is on the panel. It's a case where guys there's a foot pursuit guys running through some woods and turns and he's shot numerous times by the pursuing police officers. And what we said was that there was a time when the guy turned toward the police, that it was reasonable for the police to use deadly force because they had a fear for their own safety. But there came a point in time and we didn't decide what it was, but there came a point in time that concern was no longer objectively reasonable. And any force after that was objectively unreasonable. It seems to me that's what we have here that as the car is approaching the officers, there's a legitimate fear of officer safety. Once the car gets past them, however, that fear is gone. And in terms of the heck bar, clearly he's endangering people as the car is approaching officers. Once the car is past the officers, he's no longer endangering them. It seems to me the heck bar at that point is gone. And the plea colloquy does not invalidate the guilty plea for that very reason, that there was a point during these circumstances that he was endangering people. However, it wasn't with Jefferson because Jefferson, to say he was endangering Jefferson, I'm sorry, Leas. Leas created the situation because he ran toward the car. So are you saying that an officer can create a reasonable concern for his or her own safety by placing themselves in the zone of danger, in the scope of danger and then saying, well, wait, I'm in this field of danger here. I had a right to use deadly force. So you create your exception to the use of deadly force, the prohibition. Judge, again, in the niceties of this oral argument, I suppose perhaps he maybe should not have gotten out of his car and gotten in front of plaintiff's vehicle. But I mean, that's what officers do when they fight crime. I don't, you know. What about the other officers? Going back to Judge Fuentes' question, that's what officers do. Nobody else took a shot at the guy. Correctly so, your honor, because they were behind the motor vehicle. Now it's clear that would be a violation. So, you know, so in this particular instance, Officer Leas chose to get out of his car. What's the difference between being behind and being adjacent to, as depicted in the video? Because you said that if the officer behind had fired, that would clearly have been a violation. I'm not sure I see a difference between being behind and being adjacent to, especially if it was the officer's agents, that officer's own action put himself adjacent to. In the case I was trying to think of, it was Lamont Speed, New Jersey, not Lujan, but Lamont Speed, New Jersey. So, Judge, I think in the case where an officer is behind the motor vehicle as it's fleeing, there's no disputed facts that the car was fleeing. However, when you look at this transaction, when Officer Leas made that split-second decision, we're only talking about a couple seconds here when he was in front of the motor vehicle and proceeded to get out of the way and discharge his weapon. But again, I don't want to beat a heavens. But heck, that prevents, again, if you accept the purposes of this motion or this argument, that Leas was not in danger, then it invalidates it. And I would take one step further. The element to a liaison, which requires a risk of death or injury, it's the entire transaction. It does not just start and end with Officer Leas. So, at any point in time, you know, plaintiff put at risk, put people at risk for death or injury, again, we have to look at the totality of the circumstances. Well, I agree with you insofar as you're saying if anytime during the transaction he'd put somebody at risk for death to serious bodily injury, that would be sufficient to But to me, that's a different inquiry than whether or not Leas, his actions in shooting were objectively reasonable at that point in time of the circumstances. But I think we're saying the same thing. We may view it differently, but we're saying the same thing. And I apologize. I said I was supposed to keep track of my own time. I think I had No problem. Okay. Yeah, I've been fidgeting with my time between not being able to get it to work. Okay. Mr. Ferrari? Unmute yourself, Bob. Okay, now I think we can hear you. Okay, I apologize. I represent the municipality on the Monell claim. And in regards to the trial judge's decision, he didn't really reach any of the merits of our arguments other than the first argument, which was under the finding no constitutional underlying constitutional tort. The city couldn't be held liable. That's why I yielded most of my time to Mr. Antonelli, because that's really what's issue here is the qualified immunity. We did raise arguments in regard to the lack of training issue and the internal affairs issues. And I just, if your honors would allow me the minute I have left just to briefly address those in regard to training in New Jersey, as you're probably aware, the training of police officers is prescribed by the Attorney General's office, who lays down policies and procedures. And there's no evidence in this case that in regard to use of force pursuit, or internal affairs investigations, that those guidelines weren't filed, weren't followed. You do have testimony that an officer with a history of excessive force complaints that Leas has should have provoked retraining or some intervention on the part of the police department. Apparently they haven't intervened. There's never been a complaint sustained since 2008, according to the record. So we're dealing with perfection Well, in regard to Leas, there were three excessive force complaints prior to this, which were unsubstantiated. One was exonerated and two were unsubstantiated. In Braun versus New Hanover Police Department, that stands for the proposition that you have to show that these prior incidents were one, desirous of discipline, that the city didn't do it. And how that misconduct in those three prior incidents was similar to that. There's nothing in record, there's no discovery and nothing was presented to the trial judge in regard to officers Leas' alleged misconduct before this. What about the fact that since 2008, if I remember this correctly, not a single complaint against a police officer in the city has ever been sustained. And it looks like there's a practice of having the complaints investigated, not by internal affairs, but certainly here by the supervisor. Wouldn't that be enough for this to raise an issue of fact? If that was the fact, if those facts were in this case, but that's a gross misstatement. The testimony of, it was, I believe at the time, Deputy Chief Sacka stated that demeanor complaints, things of minor natures were delegated to supervisors, which under the New Jersey Attorney General's practices and procedures can be. In other words, if someone complains to a captain that officer Varity was rude to me during a traffic stop, that doesn't necessarily, it still invokes what's called a complaint against personnel. It goes into the internal affairs unit and under the AG's policies and procedures, it can go to a captain. There's absolutely no evidence that excessive force cases, cases other than minor demeanor cases, were ever or persons outside the internal affairs unit. The Elizabeth police department has a dedicated unit to that man by three or four officers at any given time. And in regard to training, the standard is a deliberate indifference. And here there's absolutely no evidence. The plaintiff's expert doesn't opine that there was a deliberate indifference. He says, maybe they should have been a different training. And that's all he says. So if we were to remand this on the qualified immunity issue, would it be appropriate to remand it for all the Monell claims as well? With the proviso, based on Judge McDulty's decision, I think yes, because he didn't reach her other arguments. But the remand would be allowing us to raise the three arguments that were never addressed by the court. Oh, I understand that. I understand that. That's the problem I have in arguing to you. It was never considered by the district. I don't have any reasoning for my three substantive arguments as to why I should prevail. I get it because the judge never got there. Right. Exactly. I think that's footnote three of his opinion. He says, here's what I'm doing. Right. He's not addressing those arguments. And I believe I've used my two minutes, gentlemen. Mr. Ginsburg, you reserved, I think, four minutes. Yes, Your Honor. And I know I think I ran over, so I'm going to wrap this up as quickly as I can in fairness. Just addressing the Heck v. Humphrey issue, Heck doesn't bar the appellant's claims because his success on the Fourth Amendment claim would not, and the words that you used, would not necessarily call into question his conviction on second-degree eluding claim because Heck is a sort of collateral estoppel device. That's how I view it. Once an individual admits a fact in the criminal proceeding, he cannot thereafter in a civil matter claim facts contrary to those he admitted to earlier. And in this case, the second-degree eluding in New Jersey required plaintiff to have conceded that his flight caused the risk of injury to a person. And the appellant did not make that admission. He admitted to striking a fire hydrant, which under the New Jersey appellate division's holding in Dorco, State v. Dorco, is insufficient for a second-degree eluding conviction. But in any event, Officer Elias was not aware at the time of the incident that appellant had struck the fire hydrant. So there can't be the proximate link between the hydrant and the shooting. And once the fire hydrant is removed from the equation, the appellant's allocution does not specify a particular time when he admitted to causing the risk of injury. As the colloquy developed with Mr. Antonelli in the court, it's not really a totality of the circumstances issue because the claim is against Officer Elias specifically, right? So in order for there to be a Heck bar, the claim has to involve something that Officer Elias was aware of or that he did. And when the chase first commenced, Officer Elias wasn't present. And so perhaps the appellant was conceding to having caused the risk of death or injury at that point. Or it could have been following the shooting when he continued to flee, which would make the conviction irrelevant for purposes of Heck. So it's not a totality of the circumstances approach. It's what did Officer Elias know at the time and what did he do at the time that the shooting occurred and whether that alone is sufficient to overcome the conviction. And what I think is that in this case, there's no need to overcome the conviction because they can coexist. And that's what this holding in Jasharek and Laura Pena illustrate that although plaintiff's actions may require the use of force by officers, it doesn't give those officers carte blanche to use any amount of force necessary. Their actions still have to be reasonable, which brings us back to the Fourth Amendment and qualified immunity question, the qualified immunity issues. And Mr. Antonelli brought up the fact that in Jasharek and Laura Pena, I think the issues I think there was a simple assault in one of those cases. And similarly, in the other one, and those cases did not involve, as the second degree looting does, a risk of death or injury. But there was a case that I cited in the reply brief, Smithart v. Cowery from 1996, where the Ninth Circuit said that a successful Section 1983 action for excessive force would not imply the invalidity of an arrest or conviction for assault with a deadly weapon. In that case, the deadly weapon was the car. And therefore, heck does not preclude the appellant's excessive force claim in that case. So that just again, reaffirms that the fact that at some point, there may have been a action by the appellant that caused the risk of death or injury does not necessarily mean that Officer Lewis could have used any amount of force necessary or done anything that he wanted, whether in a vehicle or otherwise, to stop the appellant. Mr. Ginsburg, could you comment on what, from your perspective, Officer Lewis should have done when confronted with the circumstances? He had already seen Jefferson drive a car. He knew that there were other police officers, quite a few, apparently, at the scene. And Jefferson is moving away from the scene and the collection of police officers towards Lewis. What should Lewis have done? Just step aside and let him go? Well, he could have stepped aside and just let him go. I think this goes back to Tennessee versus Garner. The Supreme Court has said you cannot use deadly force simply to apprehend a suspect and a fleeing suspect. And this goes back to the question that the court had for me before. You know, what could what could Officer Lewis have done? He could have simply stepped aside and let the vehicle pass or he wasn't the driver in the vehicle, but perhaps the driver of that vehicle, I think, was Officer Banos. Officer Lewis's partner could have simply blocked the appellant's way out of the intersection. So either one of those two could have resulted in there not being the application of deadly force. Did you comment before that this was not Jefferson's vehicle? No, no, this was Mr. Jefferson's vehicle. I think technically it was owned by his brother-in-law, but he he was driving it. Title was in the brother-in-law, but he was it was in his possession without any without it being permission to drive. Permission to drive it essentially. Yes. Well, not only to drive it, it was it was his vehicle permanently, even though technically title was in was in the brother-in-law. And just very briefly, with respect to with respect to the Monel issues, the expert witness, the appellant's expert witness in this case did testify or did submit an expert report and did testify that the the internal affairs personnel of the Elizabeth Police Department essentially are just administrative taskers. Their job is to make sure that these that the claims against the complaints against police are investigated. They don't actually do investigations themselves, which is one of the problems with this case, with the with the EPD's approach, which is that you have supervisors investigating their own their own subordinates, which which which is problematic because they have to work with these people. They don't want necessarily on that. They're going to look for ways to to avoid there being an impact to their subordinates as good supervisors. I should say this is not something that that necessarily implies any sort of malice, but they would want to go out of their way necessarily to to avoid placing their subordinates careers at risk, future promotions at risk, which is why most police departments, according to the expert witness, do have separate internal affairs departments so that there is no favoritism being shown, as it was in this case, when when the chief of police, excuse not the chief of police, the supervisor of police and public safety, Elizabeth, was removed because of favoritism and internal affairs investigations. And lastly, as to the deliberate indifference claim, yes, the expert did not. And this goes beyond, I think, what what the purpose, what the nature of the appeal is. But the the the the appellant's expert did not opine that there was deliberate indifference. And he didn't do that because expert that that's a that's a conclusion for the jury to make. That's that's not something that an expert witness should be opining on his his job is to explain what should have been done in his expert opinion, not what the jury's conclusion should be, which is what he would be doing if he were to say that there was deliberate indifference to the violations. In this case, unless the court has anything further, I'm sure my time has run out at this point. Yeah, yeah, it has. It has. I have nothing further. Leo, Phil, any questions? Thank you. Nothing for me. OK, thank you very much. Can we get a transcript of the argument and ask that the the police can decide how they want to split that between the city and the officer? I assume that the city would take on the payment, but I'm not going to. It's up to you guys. I want to do that. Your Honor, if I may, I did reserve minutes in rebuttal. No, I'm sorry. I didn't hear it. I didn't hear you say something about rebuttal. We never give. I can't say never. I've never seen a situation where a police had rebuttal. But if you made your presentation with that understanding, why don't we do it this way? Could you could you put your argument to a 28 day letter so that it'll be before us? And that way, at least I won't get in trouble with my colleagues and say, McKee, what the hell are you doing? You gave Napoli rebuttal. That way, we'll hear the argument without me losing my good standing with my colleagues, assuming I am in good standing with my colleagues, which may not be the case. OK, great. And then to get used to the 28 day could respond, but we got to cut this off somewhere. So unless you see something that makes you gag, the administration's 28 day letter, let's let it rest at that. Although it might not be a bad idea because Mr. Verity suggested there's nothing in the record that would establish a factual matter on the Monroe claim. If you want to take the opportunity to cite us to things in the record that you think would substantiate the Midell claim on deliberate indifference, feel free to do that. You don't have to necessarily respond to Mr. Antonelli's letter. I will do that. Thank you very much. Thank you. Thank you, gentlemen, very much for taking that as an advisement.